**MODEL IMPERIAL SUPPLY CO., INC., Plaintiff,**

**v.**

**WESTWIND COSMETICS, INC., a/k/a Westwind Cosmetics, Barry Timberg, and Josh Widman, Defendants.**

No. 91–CV–4154 (JRB).

United States District Court,
E.D. New York.

July 27, 1993.

Goodman, Saperstein & Steinitz (Stanley Goodman, Martin I. Saperstein, of counsel), Garden City, NY, for plaintiff.

Abraham & Silver (Herbert J. Silver, Jaenam Coe, of counsel), New York City, for defendants.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

This is a diversity action for breach of contract, breach of implied warranty of merchantability and negligent misrepresentation concerning a sale of allegedly counterfeit "Drakkar Noir" men's fragrance.

### I. Background and Contentions of Parties

The Drakkar Noir trademark is owned by Parfums Guy Laroche, S.A., ("Guy Laroche") a subsidiary of L'Oreal, S.A., both of which are French corporations. Procosa, Inc., ("Procosa"), which is a Brazilian corporation owned by L'Oreal, is the exclusive Brazilian manufacturer and distributor of Drakkar Noir. Cosmair, Inc., ("Cosmair"), which is an independent domestic corporation, is the exclusive United States distributor of Drakkar Noir. Drakkar Noir manufactured by Procosa in Brazil is sometimes imported and sold in the United States through unaffiliated third parties.

Both plaintiff Model Imperial Supply Co., Inc. ("Model") and defendant Westwind Cosmetics, Inc. ("Westwind") are in the business

of selling and distributing fragrances and cosmetics. The complaint alleges that Westwind, through defendant Barry Timberg, Westwind's President, and defendant Josh Widman, a Westwind employee, falsely or recklessly represented to Model that Westwind had for sale a supply of 1.7 oz. size Brazilian Drakkar Noir "pieces" manufactured by Procosa. A piece is a term used within the fragrance industry which refers to a single bottle of fragrance and its packaging. Model, which purchased 20,000 pieces of 1.7 oz. Brazilian Drakkar Noir from Westwind, alleges that they were counterfeit.

The complaint sets forth the following four causes of action: (1) breach of contract against Westwind; (2) breach of implied warranty against Westwind; (3) negligent misrepresentation against all defendants; and (4) misrepresentation and false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), against all defendants. Model seeks $163,280.07 in damages from Westwind, and $100,909.82 from Timberg and Widman to recover losses allegedly incurred from the purchase and resale of 10,847 of the 20,000 pieces. Defendants deny the allegations and claim that the pieces were genuine Drakkar Noir manufactured by Procosa. They counterclaim for $41,400 on an unpaid invoice to Model representing the final shipment of the pieces.

Summary judgment was granted in favor of defendants on the fourth cause of action. *Model Imperial Supply Co. v. Westwind Cosmetics, Inc.*, 808 F.Supp. 943 (E.D.N.Y.1992). The remaining three causes of action were tried without a jury for five days. At the close of the case, defendants moved pursuant to Fed.R.Civ.P. 15(b) to amend their answer to include the defense of accord and satisfaction. The Court reaches the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## II. *Findings of Fact*

1. Model was a Florida corporation, with its principal place of business in Boca Raton, Florida, at the time this action commenced. Model's shares are owned by its President, Harold Ickovics, and his mother. Model sells fragrances to retailers including Kroger Co. ("Kroger"), Walgreen Co. ("Walgreen"), and Jack Eckerd Co. ("Eckerd").

2. Defendant Westwind was a New York corporation, with its principal place of business in Brooklyn, New York, at the time this action commenced. Westwind's shares are owned by Timberg.

3. Defendant Timberg resided in Brooklyn, New York at the time this action commenced.

4. Defendant Widman resided in Brooklyn, New York at the time this action commenced.

5. The amount in controversy exceeds $50,000.00.

6. In December 1990, Ickovics, Timberg and Widman met at Model's former office located in Woodside, New York and discussed the possibility of Model purchasing from Westwind a supply of 1.7 oz. Drakkar Noir pieces manufactured by Procosa. Model had previously purchased Drakkar Noir manufactured by Procosa on two occasions and Ickovics knew that counterfeit Brazilian Drakkar Noir was sometimes sold in the United States. For this reason, Ickovics asked about the source of pieces. Timberg responded that Westwind had a contact in Brazil who could obtain Drakkar Noir which had been manufactured by Procosa and then sold to authorized Brazilian retailers.

7. The parties agreed that Model would purchase all the Brazilian Drakkar Noir Westwind could supply at a price of $11.50 per piece. Model agreed to pick up shipments from Westwind's warehouse at its expense.

8. From January to April 1991, Model purchased 20,000 pieces of 1.7 oz. Drakkar Noir at $11.50 per piece from Westwind.

9. Model resold many of the 20,000 pieces which it purchased from Westwind to Kroger, Walgreen, and Eckerd. Model's average resale price per piece was $17.25, with an average profit per piece of $5.75. Trial Transcript, ("Tr.") at 114.

10. Westwind acquired the Brazilian Drakkar Noir that it sold to Model from Abby Petzenbaum, a resident of Sao Paolo, Brazil. Westwind made all purchases and

resales upon Petzenbaum's representation that the pieces were manufactured by Procosa.

11. Although unknown to the parties at the time the sales occurred, Petzenbaum had previously sold suspect 1.7 oz. Brazilian Drakkar Noir pieces to Allegis Trading Co. Cosmair routinely tests Drakkar Noir pieces at points of sale throughout the United States in order to protect its proprietary rights. Cosmair tested several of the pieces Petzenbaum sold to Allegis, determined they were counterfeit, and brought suit pursuant to the Lanham Act in the U.S. District Court for the Southern District of New York. *Parfums Guy Laroche and Cosmair, Inc. v. Allegis Trading Corp., Marathon Freight Services, Inc., and John Doe Nos. 1–10,* 90–CV–6724 (RWS) (S.D.N.Y.1990). That action culminated in a judgment by consent enjoining defendants from selling counterfeit Drakkar Noir 1.7 oz. pieces. On July 18, 1991, Timberg received formal notice of Cosmair's legal proceedings involving Petzenbaum. Pl. Ex. 6. This date is several months after the sales to Model occurred.

12. On April 11, 1991, Kroger received notice from Cosmair that Cosmair inspected pieces of Brazilian Drakkar Noir purchased at a Kroger store in Atlanta, Georgia, and found them to be counterfeit. Pl.Ex. 34. These pieces were traced to Model.

13. Kroger forwarded a copy of the Cosmair letter to Model and demanded that Model recall all unsold pieces in its possession.

14. In late April 1991, Model began to recall the Westwind pieces sold to Kroger, Walgreen and Eckerd. This process took approximately four months.

15. Model recalled 4,906 Westwind pieces which it had resold. Model had remaining in its inventory 5,941 Westwind pieces. Thus, a total of 10,847 pieces were eventually quarantined by Model at its warehouse in Boca Raton. All other pieces could not be recalled because they had already been purchased by consumers at points of sale.

16. Kroger, Walgreen and Eckerd charged Model $2,600.46 in handling charges for the recall. Model also claims that it incurred $14,968.86 in recall expenses. Since this amount is arrived at by estimating these expenses, it has not been proven by a fair preponderance of the evidence. Tr. at 113–14.

17. On May 1, 1991, Model informed Westwind that it intended to revoke its acceptance of Westwind's goods based upon Cosmair's conclusion that they were counterfeit. Def.Ex. W.

18. On June 12, 1991, Ickovics, Model's attorney, Stanley Goodman, Timberg, and Widman met at Goodman's office to discuss the dispute. The parties orally agreed that Westwind would take back the recalled pieces, refund Model's purchases, and settle all claims. *See* Def.Ex. AA.

19. Cosmair thereafter tested several quarantined Westwind pieces and determined that they were counterfeit. Cosmair threatened Model with a civil action pursuant to the Lanham Act if it shipped the quarantined pieces to Westwind as previously agreed. Model then capitulated to Cosmair's demand that it turn over to Cosmair the quarantined pieces for destruction.

20. On January 16, 1992, Refurbco Inc., acting on behalf of Cosmair, destroyed more than 99% of the quarantined pieces. Several pieces were retained for purposes of this litigation. Pl.Ex. 20.

### Gas Chromatography Tests

21. On February 9, 1993, Cosmair, acting at the request of Model, tested two of the recalled pieces, Pl.Ex. 38 and 39, against a retained stock sample of authentic Drakkar Noir. Michael Kravetz, an analytical chemist at Cosmair who was qualified by the Court as an expert, conducted the tests.

22. It is undisputed that there is one secret formula for Drakkar Noir. Guy Laroche's authorized licensees around the world produce Drakkar Noir according to this formula. Thus, the Cosmair's use of a stock sample of Drakkar Noir manufactured in Paris rather than a stock sample of Drakkar Noir manufactured in Brazil was a legitimate test protocol.

23. Cosmair tested the Westwind pieces against the stock sample using gas chromatography. Gas chromatography involves heating a liquid until it turns into gases. The gases travel through a high resolution capillary column which may measure over 200 feet long. The vapors travel through the column at different rates and quantities depending upon the volatility and quantity of each vaporized compound. The most volatile compound, i.e., the compound with the lowest boiling point within a mixture, will vaporize and travel along the column first, and the least volatile compound will vaporize and travel along the column last. These events are recorded by electronic sensors and reflected in a graph showing "peaks." Each peak represents a vaporized compound and the size of each peak relative to the graph axes indicate the quantity of that vaporized compound. The most volatile compound will appear as a peak closest to time zero on the graph, and the least volatile compound will appear as a peak the farthest from time zero.

24. There are several gas chromatography test methods. Cosmair performed its gas chromatography tests using the "liquid injection" technique, whereby a mixture is removed from its container with a syringe, injected into a capillary tube, and heated within it. The second relevant type of gas chromatography test is the "head space" technique, whereby a mixture is heated before it is placed within a capillary tube.

25. Cosmair conducted its liquid injection gas chromatography tests using two types of capillary columns: polar and non-polar.

26. Plaintiff's Exhibit 23 reflects the results of the two gas chromatography tests conducted by Cosmair. The graphs indicate the presence of four compounds, identified therein as peaks #1–4, in the Westwind pieces which are not in the stock sample. The graphs also show one compound, identified therein as peak #5, which is in the stock sample but absent from the Westwind pieces. Based on these differences, Kravetz concluded that the Westwind pieces are not genuine Drakkar Noir. Tr. at 220–28.

27. Defendants employed Volumetric Measurements, Inc., ("Volumetric") to conduct a blind head space technique gas chromatography test on one of the Westwind pieces. Defendants purchased nine samples of Drakkar Noir from various retailers in the New York metropolitan area, but did not offer any evidence substantiating their source of origin. They turned these nine samples and a Westwind piece over to Volumetric. Defendants' Ex. Q reflects the results of Volumetric's gas chromatography test.

28. Dr. T.L. Chan, Laboratory Manager and Technical Director at Volumetric, who was qualified by the Court as an expert, interpreted the graphs to indicate that the ten samples are "similar." Def.Ex. Q.

29. The Court finds that the gas chromatography tests conducted by Cosmair are more accurate and reliable than the tests conducted by Volumetric. Several reasons support this finding. First, the Cosmair tests produced graphs showing approximately 100 peaks for each mixture while the Volumetric test produced graphs consisting of approximately eleven peaks for each sample. Since each peak represents a vaporized compound, the Cosmair graphs more accurately reflect the composition of the mixtures. Second, Cosmair's liquid injection method is more likely to produce a more accurate result because a subject mixture is heated inside a capillary column, thereby insuring that its most volatile compounds will vaporize within it. Volumetric's head space technique is comparatively less accurate because it calls for heating a mixture before it is injected into a capillary column, thereby running the risk that some compounds will vaporize before they can be measured inside the column. Third, Cosmair conducted tests using different types of capillary columns and achieved parallel results. Volumetric only used one type of column. Fourth, the reliability of the Volumetric test is subject to question because the sources of the nine comparison sample pieces are unsubstantiated.

30. Even setting aside the relative accuracy and reliability of Cosmair's and Volumetric's gas chromatography tests, Chan only concluded that the samples he tested were similar. Similarity does not establish

identity with the genuine item. Thus, the Volumetric test did not directly counter the plaintiff's proof that the Westwind pieces are counterfeit. Tr. at 232.

### Organoleptic Tests

31. Cosmair also conducted blind "organoleptic" or sensory odor profile tests of the Westwind pieces against a stock sample. These tests were conducted by Nancy Williams, an organoleptologist at Cosmair. Williams concluded that the Westwind pieces were counterfeit because their organoleptic profiles were "significantly different" from the stock sample. Pl.Ex. 23; Tr. at 293.

### Source of Origin of the Westwind Pieces

32. Petzenbaum testified that the pieces he sold Westwind originated from Procosa. Tr. at 376. He purportedly made his purchases from various Brazilian retailers, but where those retailers obtained the pieces was outside his personal knowledge. Thus, defendants offered no credible evidence tracing the origin of the Westwind pieces to Procosa.

33. Petzenbaum also commented about Procosa's problems with manufacturing Drakkar Noir of uniform quality. Tr. at 385–87, 450. Petzenbaum's testimony on these matters was beyond his personal knowledge and consequently inadmissible. Thus, defendants offered no credible evidence concerning its theory that Drakkar Noir manufactured by Procosa is so poorly made that its chemical composition may change over time ·and come to resemble counterfeit formulations.

34. The Court concludes that Model proved by a fair preponderance of the evidence that the Westwind pieces were counterfeit based on the following: (1) Cosmair's gas chromatography test results; (2) Cosmair's organoleptic test results; and (3) a lack of evidence tracing them to Procosa.

### III. Conclusions of Law

1. Diversity subject matter jurisdiction over this suit exists because there was complete diversity of citizenship at the time the suit was filed and the amount in contro-

versy exceeds $50,000.00. 28 U.S.C. § 1332. New York law applies to this action. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

2. Defendants' motion to amend its answer to include the defense of accord and satisfaction was untimely and, in any event, without merit since there was no evidence of a written agreement between the parties. Settlement negotiations which lead to an executory accord are not binding unless the accord is reduced to writing. *See* N.Y.Gen.Ob.Law § 15–501 (McKinney 1989); *Condo v. Mulcahy*, 88 A.D.2d 497, 454 N.Y.S.2d 308, 310 (2d Dept.1982).

3. That Model and Westwind had an enforceable contract for the sale of 20,000 pieces of Drakkar Noir manufactured by Procosa is not in dispute.

4. Model revoked its acceptance of the Westwind pieces · in accordance with N.Y.U.C.C. § 2–608 (McKinney 1964). Model notified Westwind in a timely manner of its revocation pursuant to N.Y.U.C.C. § 2–608(2) (McKinney 1964) after learning about the non-conformity through Kroger and Cosmair. Model's decision to turn over the recalled pieces to Cosmair, through Refurbco, for destruction was reasonable under the circumstances because the pieces have been shown to be counterfeit and therefore absolutely worthless. *See also Frank's Maintenance & Engineering; Inc. v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 42 Ill.Dec. 25, 30, 408 N.E.2d 403, 408 (1st Dist.1980) (whether buyer wrongfully exercised ownership over worthless goods by destroying them after it had revoked its acceptance is a question of reasonableness under the circumstances).

5. Model established by a preponderance of the evidence that Westwind breached its contract by selling counterfeit pieces which were represented as Drakkar Noir manufactured by Procosa. N.Y.U.C.C. § 2–607(4) (McKinney 1964).

6. Westwind breached its implied warranty of merchantability because the Westwind pieces do not "conform to the promises or affirmations of fact made on the[ir] contain-

er[s] or label[s]...." N.Y.U.C.C. § 2–314(2)(f) (McKinney 1964).

7. Timberg acted as an officer of Westwind when he negotiated the sale of the pieces with Model. He did not act in a negligent or reckless manner in the disputed transactions. He was not aware and did not have sufficient reason to suspect that Petzenbaum was involved in the sale of suspect 1.7 oz. Brazilian Drakkar Noir pieces to Allegis Trading Corp. when the sales to Model occurred. He cannot be held personally liable under a theory of negligent misrepresentation.

8. Widman acted as an employee of Westwind in this transaction. He did not speak as Timberg negotiated the sale of the pieces with Model. Even if he did, he did not act in a negligent or reckless manner in the disputed transactions. Like Timberg, Widman was not aware and did not have reason to suspect that Petzenbaum was involved in a sale of suspect 1.7 oz. Brazilian Drakkar Noir to Allegis Trading Corp. when the sales to Model occurred. He cannot be held liable under a theory of negligent misrepresentation.

9. Model refused to pay $41,400 on Westwind invoice No. 5133 for the final shipment of 3,600 Westwind pieces. Def.Ex. U. Westwind is not entitled to recover on that amount and therefore its counterclaim is hereby disallowed.

10. Model's claim for $14,968.86 in recall expenses is hereby disallowed because it was not proven by a fair preponderance of the evidence.

11. Having determined that Westwind breached its contract and its implied warranty of merchantability to Model, the Court finds that Model is entitled to damages pursuant to N.Y.U.C.C. § 2–714 (McKinney 1964) as follows:

a. Cost of 7,247 pieces at $11.50 per piece (adjusted for unpaid invoice No. 5133): $83,340.50.

b. Handling charges on returns: $2,600.48.

c. Lost profits for 4,906 recalled pieces at an average profit of $5.75 per piece: $28,209.50.

IV. *Conclusions*

For the reasons stated above, plaintiff Model Imperial Supply Co., Inc., is hereby awarded judgment against defendant Westwind Cosmetics, Inc., in the amount of $114,150.48.

SO ORDERED.

### MEMORANDUM–DECISION AND ORDER

WHEREAS, on July 26, 1993, this Court issued a memorandum-decision and order ("Order") in the above-captioned matter; and

WHEREAS, the Order did not specify an award of interest;

IT IS HEREBY ORDERED that the Order be amended to include the following sentence after the last sentence at page 16:

Interest on the judgment shall be recovered as of October 24, 1991 pursuant to N.Y.C.P.L.R. § 5001 (McKinney 1992).

SO ORDERED.